Nina Shervin, M.D. v. Partners Healthcare System, Incorporated, et al. It's nice to have the Court take a brief break right before you have to argue, isn't it? I appreciate it, Your Honor. Ellen Zucker for the appellant, Dr. Nina Shervin. May it please the Court. And before we get started, I'd like to reserve if the Court will allow five minutes for rebuttal. This case is about what happened to Dr. Nina Shervin during the course of her residency with the defendant institutions and under the leadership of the individual defendants. It is about, make no mistake about it, a course of conduct, of ongoing discrimination, of punishing, if sometimes hidden, or cynically denied, retaliation that existed over a period of time and culminated ultimately in jobs denied, opportunities derailed, and a career, a promising career, moved aside. Now, I expect that you will hear from my good brothers and sister that this was a case that took a long time to try and that the jury heard the evidence and they just simply didn't believe Dr. Shervin. I will come back to what the defendants themselves have said about the quality of some of the evidence that was let in in this case. But fundamentally this is an appeal about the trial court's misapprehension of its role. This appellant has no quibble with the notion that the jury can play an important gatekeeping role, but it is neither appropriate nor right for a trial court to stand as sentry, locking the door, and taking from the jury the tools that it, by right, should have to determine what events occurred and why over a course of time. And to hear powerful direct evidence of bias, powerful more than you most have in cases that are even successful in retaliation and discrimination, evidence from the decision makers, party opponents, admissions of bias and retaliation. Tell us what the court did wrong that you think we should reverse it for, specifically. The trouble started at summary judgment. At summary judgment this court decided that as a matter of law a cause of action apparently accrued when Dr. Nina Shervin was sat down in February of 2007 and placed by her residency director in the Harvard combined orthopedics program on probation. As a matter of law sometime in that spring the judge appears to have determined that cause of action accrued such that she was obliged to go to court at that time. Do you agree she, the next day she could have gone to court, or she could have gone to the EOC? Well, you are... She'd been told she'd been put on probation, she'd been told that prohibited her from moonlighting, it had a tangible effect, whether she wanted to do it or not, and she'd been told it would have serious consequences for her career. The moonlighting point first raised on appeal here is a red herring. The only time moonlighting was raised by the plaintiff as a source of concern and damage was when she, by right, in June of 2008, having graduated from the residency program, would have, without probation, been given a full license. And then the testimony was, and the only testimony cited by the defendants in a kind of elliptical fashion, the only testimony is that she lost that tangible right in July and August of 2008 when she was given a limited license, contrary to the assurances made. But that evades Judge Kayada's point, which is the day after she was told she could have been put on probation, she could have instituted a proceeding before the EEOC or the MCA did. Isn't that so? I mean, that's a yes or no question. Well, it is in certain circumstances. In this circumstances, I do not believe she could have, Your Honor, and here's why. Here's why. It is without a doubt that she believed upon learning information about being placed on probation that it was likely biased and she was concerned that she was subject to starting retaliation at that time, to be sure. She was then told the following, don't worry, it's not an adverse action. We're not even going to give you the process, do you? You will see in the papers the two processes contractually owed. Now you've fast-forwarded in time, but we were being more precise in our questions. We were simply asking the day after she'd been put on probation and told that it would have serious consequences for her and she heard from Burke that it was because she didn't cry, couldn't she have gone to the EEOC and filed a complaint? I think what would have happened had she done so, she surely could have, but had she done so, it would likely have been dismissed because the defendants would have come in and said it's speculative, the language is actually, it may cause you. They then would append their decision telling her about the ratification of probation in June of 2007 when they say it will have no negative consequences. So that's the central thing that you say makes this a continuing violation and the statute, even though the probation was over with by the time the statute of limitations bar came into being, even though the probation was entirely over with because at that point you're saying she didn't know that this might cause her to get a conditional license. That's true and the facts in this case underscored with great significance and the facts are these, Your Honor, the facts are that she was affirmatively told that it would not have the consequences it ultimately had. In that circumstance one cannot imagine... Why is that critical to her right to sue? I'm not understanding. If the probation was improperly imposed as a result of why is the fact that she didn't understand the full consequences of the probation mean that she didn't have to bring suit? But there are two issues here. One is that I do not believe that the discreet act in this case, the fact of probation was sufficiently harmful that this court, on appeal, would consider it an adverse action. In other circumstances it may, but not this, where they told her repeatedly, don't worry, it's only internal, it's only academic, it won't affect you. But second and perhaps... Is there any case law that says or even suggests that the imposition of probation on a professional is not a sufficient adverse action? The Bagadanian case, Judge Toro's case, decided the very spring Dr. Shervin was put on probation, made that point. And, Your Honor, if I may, let us assume, for argument's sake, that the probation is a definite act. I don't believe it is, but let us assume for argument's sake it is. That does not dispense with what the district court did here. Because there were claims that arise out of that triggering event, aiding and abetting discrimination, interference, and a punishing and hidden campaign of retaliation. But now you've combined two things. There's the discrimination, and then there's a question of whether there's continuing discrimination, and then there's a retaliation claim. Yes, Your Honor. And there's a question of whether there's continuing retaliation. I'm not sure of any precedent that would allow you to combine and sort of butt in the two to run them both together. I think you need one claim or the other to satisfy the continuing violation theory to sustain that claim, whether it's the retaliation claim or the discrimination claim. And where is your evidence of continuing sex discrimination as opposed to continuing acts of retaliation? With respect to the retaliation, there is evidence in the spring of 2007 by a member of the Harvard Executive Committee, Mark Gephardt. That wasn't my question. My question was where are the where's the evidence of continuing sex discrimination as opposed to the evidence of continuing retaliation? Well, I was trying to answer if I could, I'm sorry. The answer, Your Honor, lies in the combination of the two. The conduct of the defendants here shows a vast anger at the temerity of this young woman, a guest at a largely male table, raising this issue and persisting with it. And what I would urge this Court to consider is the state law policies at issue here. Whatever Title VII and its jurisprudence would do, this Court has recognized that in Massachusetts, under Massachusetts law, discrete acts may be part of a continuing violation. And even so, in this case, even so, in this case, the policies under 151B, which are different statutorily and different under regulation, require this result. And finally, let us assume for a moment the continuing violations doctrine would not apply. And I don't concede the point, but even assuming it, for argument's sake, the jury instructions gave away too much. Because... Go back to this prior point. You're saying in Massachusetts law, discrete acts don't, the occurrence of discrete acts doesn't preclude the argument. But isn't that only if the Because if you look at the Clifton case, for instance, or you look at Pelletier, or you look, in fact, at this Court dealing with 151B and as recently as Diaz, what you see is a combination of discrete acts and environment. In Clifton, the retaliation facts were transfers, disparate discipline, and failure to provide job opportunities. Things that looked at, if you want to do it in a sort of cut-up lens, look like discrete acts, if you want them to be. But the Clifton court said they combined. The issue is, do they develop, do they accumulate over time? And if they do... But isn't the test whether the individual in question would think that things might get better? In other words, the policy here is to suggest that people shouldn't immediately run to court if they think that the situation is going to be improved and remedied. Now, what basis did she have at the time the statute of limitations bar existed that things would get better, that there would be a remedy here? The affirmative statement of the chief medical officer who oversaw graduate medical education. He said, it is purely internal, it will not follow you. In fact, when it looked as though it was changing in the summer of 2008... There's no suggestion that he was going to do anything to eliminate the probation or revoke it or whatever? Actually, the record is contrary, your honor. He sought to have that done in the fall of 2007, in the spring of 2008, and then after June 13, 2008, again. But the EC denied it, didn't they? The EC refused to revoke it. They ultimately refused to revoke it, which is itself... She knew they refused to revoke it. Not until the summer of 2008, and then she pursued the second step of the grievance, and ultimately in 2009, she was told it would not be removed. I want to make sure that I have time here very quickly to address what I have to say, because whether or not there's a continuing violation, there have been seismic exclusions of evidence in this case that alone warrant reversal. When you have the chief, when you have the president and CEO of MGH saying to its chairman, no court in the land will force me to hire Nina Shervin, that direct evidence of retaliatory ire, as a jury may well find it, should not have been excluded. When you have statements made by an executive committee member of the Harvard Executive Committee to the effect that I will not hire her... I thought the suggestion was not that he was retaliating against her, but that somebody else, that there's other three jobs at Kubli and so on and so forth, were the result of retaliation. But what does this statement have to do with that, as to whether the supposed revocation or deprivation of job offers was retaliation for what she had done earlier? That's right, Your Honor, and he was involved in the decision not to bring her on to staff in the summer of 2009. And I cannot sit down, or I hope I don't have to sit down, until I raise the other issues here, which is the question of the exclusion of strong evidence of pretext that was kept from the jury when the evidence from John Selitsky was excluded, where the decision makers, in this case the vice chair of the Department of Justice, wanted to hire someone informally, and because of this lawsuit decided not to. In one of these cases, the trial judge has got to manage, you've got an infinite supply of comparable or arguably comparable events for both sides. Don't we apply an abuse of discretion standard to the court making those decisions? With respect to direct evidence of animus and admissions of party opponents, they are errors of law. That's not so, counsel. Rulings admitting or excluding evidence are reviewed for abuse of discretion, and that's particularly so in a case like this one, where the district judge premises her rulings in many of the instances you've mentioned on Rule 403, which requires her to balance the prejudicial effect against the probative value. But taking that to be so, your honor, the challenge here is that when you take from a case like this, strong, direct evidence of bias and retaliatory animus, when you take out of this case the traditional stuff of discrimination cases, you bar the door. This case... But they let you... How many days did this trial go on? Well, we had forty hours. The case went roughly twenty-five days, all but two of that being evidence presented by your side. That's actually not so, your honor. That is not so. You had forty hours, right? But with respect to this case, yes. Did you have forty hours? Yes, your honor. So what we're talking about is the forty-first and forty-second hour piling onto that, and a court's got to make some decision at some point. I would say, your honor, that it is more difficult to try an inferential case when you have direct evidence that has been excluded. And you cannot, in this case, look at merely the volume of the evidence. You have to look at the quality of it that was excluded. And here the challenge is that this plaintiff mustered the kinds of evidence that women in a professional setting rarely get. And it was excluded. What's your best item in terms of the exclusion of the evidence which you say was prejudicial? I think, your honor, the direct evidence of animus and the evidence excluded from Dr. McCarthy and Dr. Selitsky, which directly contradicted the stated legitimate reason for not hiring Dr. Shervin in the spring of 2009. It was directly, it was a direct attack on that. Not hiring her where? And it was excluded because it happened with respect to... Not hiring her where? Pardon? Not hiring her where? At Newton Wellesley Hospital and the MGH. So those individuals were not making the decision as to whether to hire her, right? Oh yes, well, Dr. Selitsky was speaking of one of the decision makers about whether, about admissions that he made to him about this case. We can't hire someone informally now because of Nina Shervin's lawsuit. But didn't the court rest that finding on a capacity, in other words, found you needed to show it was an out-of-court admission of a party opponent? But Dr. Freiberg, who made that statement, was vice chair of the department in charge of hiring in this specialty. But he also said, apparently all these people wear three or four different hats. And so the court had to make a finding whether they were wearing the party opponent hat. And then made a finding, as I understand it, that the person wasn't. They were acting in a different capacity. If that's correct, then we need to review that under an abuse of discretion standard. Let us assume you review it in that fashion. But this was error and it was not harmless. And it was error because he was speaking to him qua hiring vice chair. And the response was in that capacity. It was an admission. You need us to find that no reasonable judge could look at the evidence and conclude that he was speaking in any capacity other than as the vice chair of a party opponent. He said we cannot hire her. We cannot hire Ken because of Dr. Shervin's lawsuit. And I think given the fact that he was speaking to Dr. Silitsky in his hiring capacity and he was involved directly in the question of whether to hire Dr. Shervin along with Dr. Slavin in the summer of 2009, I don't see  Good morning. May it please the court, my name is Rebecca Wilson. I represent the appellee Dr. James Herndon. The appellee's counsel have divided up for purposes of this argument the issues on appeal. I will address the issues relating to the challenges to the court's ruling on the motion for summary judgment. Mr. Burgess will address, Mr. Burgess and Mr. Coakley will address issues relating to the evidence questions and Mr. Reed will address issues to the jury instruction issues. We stand before the court here today urging that the court's ruling on summary judgment be affirmed. The lower court correctly applied settled Massachusetts and federal law to the facts of this case in finding that the continuing violation doctrine did not apply to Dr. Shervin's claims of discrimination or retaliation. Let me ask you about the accrual argument. First of all, was that made below? The accrual argument made below. I don't see any suggestion that it wasn't. I think that it was, Your Honor. And then let me focus you on October 2007. And Ms. Shervin is standing there and it's after the she's been placed on probation but that it's after they've told her that they'll have no effect, doesn't apply on licensing and given her that whole spiel on several occasions. What at that point was the crystallized impact and injury on her that would have allowed her to go in and seek administrative and judicial relief? This case I think is different than the Baragayan case which Ms. Zucker addressed to the court earlier. In that case probation was instituted on a resident but it did not have any crystallized consequences from the beginning. In this case Dr. Shervin in her own words over the entire course of from 2007 until she ultimately decided to use the grievance process in 2008 consistently said that the imposition of probation had changed the terms and conditions of her employment. That she was subject to increased scrutiny, that she was Dr. Herndon's letter to her in March of 2007 which told her about probation that he had placed her on in February, told her that she couldn't moonlight, that she was going to be subject to increased monitoring. But see now you've gone back in time which raises the question I'm trying to get at. Suppose the employer comes in and says the supervisor comes in and says you're on the A list and the employee says well what is the A list? And the answer is the A list means you're going to be the first to be fired if anything happens. Well there you've got pretty serious ramification. Yes. And the employee gets ready to sue but then a month later they come in and say that was a joke, the A list simply means you get to go to lunch with someone who has no effect on your career. A person can't sue at that point, right? In this case... Even though earlier they actually could have sued. In this case, Your Honor, Dr. Herndon who imposed the probation, Dr. Rubash who's accused of engaging in retaliation, the executive committee which reviewed Dr. Shervin's case in the spring of 2007, none of those individuals are alleged to have made any statements. They were the decision makers on probation, the affirmation of probation, and the extension of probation. None of those individuals made any representations to Dr. Shervin about, and there's no evidence in the record that they made any... But wait, it doesn't make any difference who made them as long as it's an authorized person and the EC, as I understand, actually wrote her a letter to fortify what they were saying and said, probation is not considered to be an adverse action, that it won't have any negative consequences on her either in the residency program and that she won't have to list it for licensing. So, what was she to sue about at that point? She was going to sue about the fact that she felt she had been subjected to probation based upon discriminatory animus, that the probation had been ratified based upon retaliatory animus, and that the probation had been extended by Dr. Herndon based upon retaliatory animus. I think what the plaintiff... So, just being on probation, even if it has no tangible impact, is itself, if I think I'm understanding your argument correctly, you're saying probation itself for a professional doctor in this high-powered setting is itself a tangible effect? Well, I'm not sure that's what the executive committee said to her. What they said to her was that it wouldn't have any effect on her ultimate licensing and that it didn't need to be reported to the board. They didn't say that it didn't have tangible, real consequences for her as a resident in the residency program at HCOR. She was subjected to additional monitoring. She was not allowed to moonlight during the period of probation. I think that what the plaintiff is focusing on is, and the case law talks about this, that it does not obviate your need to file a claim timely because you don't ultimately know what the most painful outcome of the discriminatory acts are. Here, Dr. Shervin knew she had, or believed she had been discriminated against, believed she had been retaliated against in 2007, and that's what triggered her responsibility to file suit. The case that applies in this case under state law is the Ocean Spray versus NCAG case, which was decided in 2004. As the court knows, that set up a three-part test for determining whether the continuing violation doctrine applied and what test a plaintiff needed to meet in order to get the benefit of a continuing violation. And in that case, the court said that earlier violations outside the limitations period did not trigger the plaintiff's duty and awareness to file suit, namely that she could not have determined at the time that she had a reasonable belief that the employment actions she complains of were discriminatory or retaliatory. I guess the question here is whether under Ocean Spray, what she's basically saying, try to reframe it, is, okay, maybe I could have sued because they improperly put me on probation as a result of a discriminatory act. But the question of bringing suit is a serious thing, and has consequences for both parties. But I shouldn't have to bring suit until I know what the serious consequences of this are. And if I've been told that it doesn't have the serious consequences and I make a decision not to bring suit based on that inaccurate representation, the earlier discriminatory act shouldn't be barred by limitations when I discover that the erroneous information, in fact, was significantly wrong and that this really does have serious consequences. So I guess the question is, why isn't that additional knowledge come within Ocean Spray so that it's a continuing violation? It's not what Ocean Spray says, Your Honor. It says that the plaintiff's duty to file is triggered by her realization that she's been subjected to discriminatory or retaliatory acts. What the plaintiff has argued... But it certainly rests on the notion that you don't have to run to court every time you have a potential case, right? Well, the case law does say that if there is a discreet act of discrimination, the clock begins to run when the discreet act takes effect and when the plaintiff understands or believes that the act is discriminatory. We have to have some tangible effect as well. Yes, it has to have some tangible effect. And I would argue that Dr. Shervin, in her own words, said that the mere imposition of probation in the spring of 2007 had tangible effects on her participation in the H-Corps residency program. Is there any evidence that any residents moonlit? There was no evidence on the record, but it was clear in Dr. Herndon's letter to her on March 2, 2007, that no moonlighting was allowed. So it was a change in her status. Whether or not any other residents had ever moonlighted, that's not in the record. Unless you have any other questions, I will turn it over to my colleagues. Thank you. May it please the Court, my name is Tom Reed and I represent Partners Healthcare Systems, a system and a physician organization. And I'll address the jury challenges brought by Dr. Shervin. First, this brief aside on Judge Kayada's initial question, that is, could she bring a claim the next day? The answer is yes, because Shervin argues in the alternative, even if I'm wrong about this being a continuing violation. After all, my claim is preserved through my internal grievances, which qualifies exceptions under Massachusetts law. So she herself asserts she brought a grievance to the executive committee, redoubled before the grievance committee about a month and a half after Dr. Herndon placed her on probation. She said, and she says this in her brief at page 16, she was the victim of gender bias and she was shocked by Dr. Herndon's decision. And this Court has repeatedly held it's not a matter of whether there was one or another adverse thing that ultimately didn't hold up or was misunderstood. It's like the bundle of rights in a contract case. Herndon said that she was going to be monitored closely. She couldn't moonlight. She wasn't on track to advance. She was on academic probation. Attendance in all classes were mandatory and detailed evaluations by her supervisors were going to be conducted monthly. And that constellation of things caused her immediately to file a complaint with the grievance committee. On the jury instructions, of course, I can't address all six challenges Dr. Shervin levels against the errors of the trial judge, but to take part for whole in maybe the most significant instruction, which is reviewed by this Court under abuse of discretion. That is, there's no defendant liability for conduct before a given date. This is a phrasing challenge. And as this Court has repeatedly instructed, the exact words of that challenge matter. And Dr. Shervin alleges the judge used an ill-explained fragment in describing to the jury the use it could make of background evidence, a single parenthetical phrase about time-barred evidence, that it could bear on motive, intent, or context. And this was ambiguous, difficult to follow. There are three severe problems with Shervin's attack here, and they're typical of her other jury challenges. First, Shervin does not quote in her brief the actual jury instructions given by the judge, which appear in the record appendix at page 5089. She instead quotes a proposed instruction. And the instruction actually given by the judge is slightly different and does not allow Shervin's comment that the reference to background evidence was reduced to a mere parenthetical. In fact, the judge refers, in her instruction, to Dr. Herndon's placing Shervin on probation in February 2007 and explains to the jury that's a time-barred act as to liability for all these defendants. However, that is, it could bear upon motive, intent, or context in the non-time-barred acts. Second, as this Court has repeatedly explained, parties have to view individual instructions through the lens of the charge as a whole. And by the time the judge gave this instruction, she'd explained the way the jury could understand evidence, how it was to draw inferences, that it should consider all the evidence, and it wasn't just an accumulation, but the weight and quality of it that really mattered. That's the frame for the judge's comment. And last, the judge's instruction is correct and exactly states what this Court and courts in our commonwealth have stated about the use of background evidence, otherwise time-barred, that it bears on motive or intent or context. Dr. Herndon's placing Shervin on probation back in February 2007 might be quite enlightening about his later attitude, and the jury could so consider it if it wished. This is not ambiguous or unclear. It's quite pellucid and quite simple. And I'll stop there rather than going on through the other five jury challenges, unless the Court has questions, and turn it over to my colleagues concerning evidence. Thank you. May it please the Court, it's Attorney Robert Burgess, and I'm here on behalf of Dr. Harry Rubash. As noted previously, we're dividing some of the evidentiary issues. I heard a statement earlier today with respect to one of the criminal cases where there was a pressurized situation with respect to making decisions, and that was clearly not the case in this particular case. As you look through the record, it's clearly obvious with respect to every substantive decision the Court made, including the ones that are challenged here today, they were the subject of extensive motions in limine. To the extent that they weren't subject to motions in limine, they were addressed in lengthy sidebars. For example, with respect to Dr. Slavin's comment, it was a very lengthy sidebar, so much so that the Court felt the need after coming to a conclusion on four or three grounds to apologize to the jury. So it clearly is these decisions were made in the framework of a court that looked at the issues. Could you address the specific example that they came up with, which is of a decision maker with respect to these employment opportunities who made the decision for a retaliatory reason? And they suggest that the statement, we can't hire her because she's suing falls into that category. Could you tell us what the context is of that? Yes, and let me tell you, the context, I don't think the plaintiff fully put forth at trial. If you look at particularly that lengthy sidebar that I referred to, I would note as a preface that at the end of that sidebar, and the Court ruled on four or three grounds, it was very clear, and I think in admission by the plaintiff, that it did not apply. You're going way too fast. Sure. Let's just back up. Sure. Tell us what happened. Right. Because there's so many evidentiary objections. They're so confusing. And, you know, the relevance of them is difficult to parse. And I'm just asking you, with respect to this one, to please address the actual testimony and why the District Court didn't make an error. Sure. So Peter Slaven is the individual who allegedly made that decision or statement. He was not deposed. He was not called as a witness in the trial. It was being sought to be introduced. And what was Slaven's role in denying her employment? Dr. Slaven is the CEO of Massachusetts General Hospital. Dr. Slaven was not named as a party. Massachusetts General Hospital was not named as a party. I'm striking some questions as to whether there may have been. It wasn't that Mass General made a decision to deny her employment. What's the relevance of this statement to the denial of, the supposed denial of her employment opportunity? Well, two things. With respect to this statement, I don't read this statement necessarily as a statement that suggests animus or retaliation. It's indicating that they're not going to hire Nina Sheriff. But there's certainly, given the context of this case. Not going to hire her where? At Mass General? At Mass General. Right. And with respect to the job position, it was very clear that there was one job opening available during the time that Nina Sheriff, at all relevant time periods, went through the normal formal process, which is how all job offers went at MGH, which is you have a posting of a position, you have a need for a position, posting, sent into a journal, search committee, and a decision. There was a very specific position that was open in 2008 and 2009. It's in your materials, Exhibit 140 to 144, and you'll see that position Nina Sheriff was qualified for. She decided not to apply for that position. So to the extent, with respect to her opportunities, and it's one of the reasons why I think the court gave in part the vacant position instruction, there was a vacant position. She chose not to apply for it at a time when she was qualified for it. She ignored it. She ignored it on the advice of Dr. Burke and herself, and they came to a conclusion it was in the arts. So the theory is that whatever the improper animus toward her might have been, that she made the decision not to apply so she wasn't rejected. She never applied for that position. She never was rejected. And I would question whether this statement represents either animus or a natural reading of the statement could represent certainly that because of her shortcomings as a physician that the CEO of MGH felt uncomfortable having her on staff here with respect to patient care issues. And to the extent he decides not to hire her, you can't impute some type of, particularly out of context, a statement. And that statement was made to Jack Connors and only Jack Connors. It's not a situation similar to the Travers case. Who's Jack Connors? Jack Connors, he was an individual, and that's how the statement came up. Jack Connors was the chairman of the board of partners at the time. He was indeed. And there was no predicate that he had any hiring authority whatsoever with respect to Mass General. It was a private discussion for all intent and purposes. Jack Connors couldn't remember when the statement was made. He knew it. He couldn't remember whether it was by phone or in person. And I would suggest to you that notwithstanding, even if you assume that there's some animus with respect to that statement, it never got to any decision makers. It didn't get to Dr. Rubash or any hiring individuals there. I think that is, in a microcosm, a good example of where the court, under 403 grounds, knowing, and this point I just want to leave with because I know my time is up, if you look at the colloquy with respect to that particular position, the plaintiff has conceded that that statement applied only to partners. I agree that it was properly excluded, but it was not put in and would not have been put in as to Dr. Rubash, Dr. Herndon, or Harvard. And the plaintiff stated expressly that during the colloquy with the judge when they were seeking to admit it. So to the extent that there's any error with respect to that decision, it wouldn't apply to at least those three defendants. Thank you. Good afternoon. May it please the court, my name is John Coakley, and I represent Harvard Medical School in this case. I'm going to discuss, I'll discuss further the Dr. Slavin evidentiary issue and however much time, additional time I have for evidentiary issues, I'll cover those as well. But I should take a moment to briefly add one argument or one issue to the continuing violation statute of limitations issue that's unique to Harvard. Harvard agrees with everything, the facts, the law, as stated by Attorney Wilson. It's repeated in our brief as well. But there's one additional issue as it relates to Harvard. Something that wasn't mentioned by the plaintiff, either in her brief or her reply brief, or in the 15 minutes that she's spoken to already, is there was a different limitations date for Harvard because Harvard was not a party to the Tolling Agreement. Harvard's limitation date was December 30th of 2008, about eight months later than the date that was designated for partners because there was a Tolling Agreement between partners and the plaintiff, which Harvard was not a party to. Harvard moved a summary judgment on the issue of the applicability of Tolling Agreements. That issue was granted on that issue. It is not being appealed now. So the law in this case is that the statute of limitations date for Harvard is December 30th of 2008. I'll say three times in the plaintiff's reply brief does she reference June 13th of 2008 as a date upon which she'll acknowledge that at least by that date, Dr. Shervin Heddy, it all crystallized to Dr. Shervin. And despite the letters and the e-mails and the complaints, some very sharply worded complaints, at least by June 13th of 2008, it had fully crystallized for her, and she realized she was being discriminated against. She'd already heard from the Board of Registration of Medicine. And she's still six months. She still waited. There were six more months to pass until December 30th of 2008. How does that help you if there's a 300-day statute? The continuing violation doctrine would not apply because under the third prong of the Ocean Spray case, once the plaintiff, once she was not entitled to the application of the continuing violation doctrine before 12-30-2008, before 12-30-2008, she realized it had crystallized with her. No, no, no. Wouldn't it work if let's assume the continuing violation doctrine applies. It's a retaliation case, and each day there's a little pinprick, and the person doesn't know, and it goes on for eight months, and then finally it's obvious that it's hostile environment. Doesn't that start the 300-day clock at eight months? Well, in here the clock would start if the plaintiff's theory were correct in June when it became clear that she did have a claim. You know, my response to that would be if you look at the summary judgment papers, there were four events that were pointed to as two events that might be timely, that might actually anchor the prior event, anchor the untimely events. Only two of those happened after December 30th of 2008. You're not answering my question. Okay. I'm sorry. Let's assume you're correct. Let's take the June date. Yes, Your Honor. If that were, and I know you don't concede it, but if that were the date on which she could bring a cause of action and needed to and any continuing theory was ending or whatever, cruel, why wouldn't the 300 days start then? With respect to her… You want us to go to 300 days back to the beginning and give her no benefit, even partially, of any of the delay theories? Well, I guess at least up to June 13th of 2008, anything before then, she certainly wouldn't, all those would certainly be time-barred. I'm not sure of what happened between June 30th and 2008. You're missing the point. Okay. Hostile environment case, the hostile environment goes on for two years and then it crystallizes. That's the first day someone can sue. Don't they get 300 days to sue? They proved, Your Honor, but I would say some judgment was granted on the issue of whether or not there was a hostile work environment. Isn't the answer that the 300 days is cranked into the calculations that you've made here? Yeah. Correct, Your Honor. 300 days dates back from when she filed it, when she actually filed the MCAD complaint. And whatever was in that 300-day window was actionable. You don't want us to focus on the December 30th. You want us to focus on the date of the filing. The date of the filing. You're not saying that when we focus on the date of the filing, 300 days back as to Harvard expired in December of 2008. Yes, and that's the window of time. And I'm sorry, I guess why it's confused, because she actually did get to try all of the acts and all the events that occurred within that period of time. And she did not even request an instruction for a hostile work environment when it went before the jury. So I apologize for the confusion that I had on that. Just to touch briefly on Dr. Slavin, with respect to Dr. Slavin, and I believe it was pointed out by one of the judges, the real problem with introducing the comment by Dr. Slavin, in addition to him being ambiguous as to what he was talking about, was that there was no evidence that he communicated with anybody at Cooley Dickinson Hospital. And it was to that job, it was to that position, that she was trying to attribute or try to use that evidence. Cooley Dickinson Hospital out in the western part of the state had not been acquired by partners at the time, but there was no evidence that Dr. Slavin spoke to anybody at Cooley Dickinson Hospital about Dr. Slavin. And she rested on a potential merger, right? There was discussion of a potential merger. That's correct, Your Honor. But it would have been entirely speculative for the jury to have concluded from that ambiguous state, ambiguous as to animus. It wasn't ambiguous that he didn't want her working at Mass General. It's very ambiguous as to why he didn't want her working at Mass General. But there's no evidence that that animus, that he actually took that feeling, was actually exercised in any conduct directed at Cooley Dickinson Hospital. I believe my time has expired. But if you don't mind, I would address the Dr. Gephardt issue if I had just one moment. I think he's one of the other major evidentiary issues that had been raised by the plaintiff. Thank you, Your Honor. Dr. Gephardt, the allegations... Just briefly, just one minute on that. Sure. The statements attributed to Dr. Gephardt were made by or the witness that was going to speak to what Dr. Gephardt had supposedly told him was an official at Milton Hospital. And the context of this alleged conversation between, his name is Morrissey, Mr. Morrissey and Dr. Gephardt, was whether or not the plaintiff would be working at Milton Hospital. Milton Hospital is owned by Beth Israel Deaconess Medical Center. It is not a training location or training venue for Harvard Medical School or Harvard Medical School undergraduate students. It has, and the record before the judge, I think we were three weeks into the trial when this came up, there was absolutely no evidence that Milton Hospital had any relationship whatsoever with Harvard Medical School. With respect to Dr. Gephardt's academic appointment with medical school, that academic appointment was based at Children's Hospital. And by the terms of the professorship and the endowment, the funds that he received for his professorship were for research and academic activities at Children's Hospital, not at Beth Israel and certainly not at Milton Hospital. And the judge, having heard weeks and weeks of testimony about Harvard Medical School and the academic appointments granted by Harvard Medical School, it was clear on the record that Harvard Medical School exercised no authority, control over the hiring decisions made by Dr. Gephardt as chief of orthopedics at Beth Israel Deaconess Medical Center. The conversation between Dr. Morrissey and Dr. Gephardt was a conversation about how two hospitals with common ownership, Beth Israel, were going to allocate and use Beth Israel money and Beth Israel jobs. That was the position that Dr. Sherman claimed she was denied. It has nothing to do with Harvard Medical School and the exclusion of that evidence because the plaintiff failed to lay a foundation that Dr. Gephardt, that those conversations related to any agency that Dr. Gephardt had with Harvard Medical School. And that agency being a professorship at Children's Hospital. Thank you. Thank you. To pick up where my good brother just left off, I will simply refer the court to Exhibit 56. In Exhibit 56 is the advertisement for the total joints specialist, the position that Dr. Sherman applied for, which was going to be working in the community hospital, Milton Hospital, with a position at BIDMC and HMS. And in the advertisement itself, it lists Harvard and BIDMC as joint equal opportunity employers. Dr. Gephardt was in charge of that search. He pulled the search when Dr. Sherman was presented as the candidate. So I think he proves too much in his comments. And before leaving the continuing violations doctrine, what is concerning to me is that the representation of the doctrine at state law by my good colleague is essentially the revelatory standard that was discredited in Kadair. In Kadair, the question was posed with a plaintiff who experienced in her own testimony from day one discrimination and filed internal complaint after internal complaint. In other words, awareness, conduct that on its own, if it existed as a slice, could have been actionable. But it kept on going over time. And indeed, she testified that she was concerned about raising concerns perpetually because when she did, she faced further retaliation. The court said that the test was, does the conduct continue and accumulate over time? And if so, does the plaintiff believe it's unlikely to improve? And would a reasonable person in her shoes rush off to complain? Kadair expresses a strong policy, Massachusetts policy, that has been acknowledged in this court in Tooley, in Diaz, in Noviello. And that is that the Massachusetts policy is steadfastly against forcing a plaintiff to rush off to court at each slice along the way. It says it's not in the interest of the plaintiff and not in the interest of employers. Because employers then are going to have these seriatim complaints for small things or plaintiffs will be barred from the courthouse. Now, in Ocean Spray, the test is not what my good sister represented. Ocean Spray was a reasonable accommodation case. And in that case ‑‑ Let me ask you, counsel, one thing that's confusing me. This evidence, this, in the earlier period, the evidence went in, but the jury was told they couldn't base liability on it. So they heard it all. And then they heard weeks' worth of additional retaliatory evidence that you pointed to as retaliatory. Yes. They didn't buy that. Why would we think that if they'd heard of these other events that seemed to me to be lesser than denying a job and the like in an earlier time period that the jury would have bought that? Because of the instruction, Your Honor. The jury's instruction was, and at the third day of trial, she said it may not be the basis for any liability or damages. Now, my good sister suggests that Ocean Spray says liability and damages, but it says liability and damages. Where an element of the claim is intent and the intent may be located in the statements and the conduct in what was determined to be the time barred period. What's a jury to do with that? In other words, yes, they hear some comment about background evidence, but repeatedly, the third day of trial, and then in their instruction, they are told it cannot be any basis for liability or damages. That's not the law. The law permits, particularly in the retaliation context, particularly in the Massachusetts claims for aiding and abetting discrimination and interference, the accumulation of facts and the considering of that for liability. Indeed, in Ocean Spray, even where the continuing violation doesn't apply, because the analysis there was the plaintiff should be understood to have considered the situation hopeless, because he kept on asking for accommodation and there was no sense that they were ever engaging in an interactive process. So the court says you should have found yourself hopeless, hence no continuing violation. But even there, where there was a letter within the limitations period, the court goes on to say that letter may not have looked like an accommodation request unless you pull in that prior conduct to understand that it meets the element of the claim. This jury was in no position to understand that. And so with great respect, when you look at the evidentiary exclusions here, you look at the decided tilt in the evidence, with self-serving notes going for notice and knowledge and notes that would have favored the plaintiff staying out. It is the position of the plaintiff here and the seven civil rights organizations that have joined us in amicus support, with an amicus written by Judge Nancy Gertner, that upholding this verdict will chill what this court, from the Supreme Court down, has recognized as an important right to access these courts for discrimination and particularly for ongoing retaliation.  Thank you, Your Honor.